KRAVITCH, Circuit Judge,
concurring in part and dissenting in part:
Although I agree with much of the majority’s opinion, I must respectfully dissent from its judgment. Specifically, I agree that we have jurisdiction, that the Endangered Species Act claim was mooted, and that the district court’s NEPA analysis was erroneous. But I would affirm the district court’s disposition of the Clean Water Act claim, as well as its remedial decisions.
First, I agree with the majority that we have appellate jurisdiction over the Summary Judgment and Remedies Orders. The latter order is, in substance, both an injunction, for the reasons explained by the majority, and a final order, because any new mining permits issued in response to the district court’s vacatur and remand would be based on a different administrafive record, and might well have different terms and conditions. Thus, after the Remedies Order, there was nothing more to be done in the district court with respect to these permits.
Second, the majority is also correct that the Endangered Species Act claim was mooted by the Corps’ consultation with the Fish and Wildlife Service. Unlike the majority, however, I believe we should resolve on this appeal whether the mining companies are entitled to vacatur of the ESA judgment. The district court rejected a motion to vacate the ESA claim as moot, and there is no reason to believe the equities have changed since then. Because I would reach this issue, I would hold that the mining companies are not entitled to vacatur. As the leading Supreme Court case makes clear, vacatur of a judgment on appeal is an equitable remedy, and the predominant equitable consideration is whether the mootness is brought about by the party seeking appellate review, by the prevailing party below, or by happenstance. U.S. Bancorp Mortgage Co. v. Bonner Mall P’ship, 513 U.S. 18, 25, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). In particular, when a case becomes moot by the voluntary action of an appellant, vaea *1365 tur is typically not appropriate. See id. at 26, 115 S.Ct. 386. This rule does equity because when an aggrieved party moots his appeal by his own conduct, he not only abandons his right to appellate review but also forfeits any argument that the preclusive effect of the judgment against him ought to be erased.
Here, the Corps mooted the ESA claim. The Summary Judgment Order determined the Corps was in dereliction of its duties under the Endangered Species Act by failing to consult with FWS about the effects of the instant mining on the wood stork. The Corps acquiesced in this determination by undertaking the consultation required by the ESA. Were it a party to the appeal, the Corps could not obtain vacatur because it mooted the claim. Granted, the mining companies, not the Corps, are the parties now requesting vacatur. But as against the plaintiffs, their equities are no better than those of the Corps, whose decision they benefit from and are defending. The plaintiffs brought this litigation, in part, to force the Corps to comply with the ESA. They won, obtaining summary judgment. The Corps then fulfilled its procedural obligations rather than seek review here. Equity entitles the plaintiffs to maintain their judgment, with the preclusive effect and prevailing party status which accompany it. See, e.g., Morillo-Cedron v. District Director, U.S. Citizenship and Immigration Svcs., 452 F.3d 1254, 1257 (11th Cir.2006) (discussing prevailing party status). Accordingly, I would expressly deny the vacatur sought by the mining companies.
Next, I turn to the National Environmental Policy Act claims. Again, I agree with the majority that although the district court cited the correct NEPA standard of review, it applied substantially the wrong one. The district court did find procedural faults with the permitting process, and those faults may be a sufficient basis to conclude that the Corps violated NEPA. But the district court’s evaluation of procedural NEPA compliance is so intertwined with a substantive critique of the Corps’ decision that it is simply impossible for a reviewing court to separate harmless from prejudicial errors.
Yet the district court’s NEPA errors are not fatal to its judgment. Because I believe the district court correctly determined that the Corps violated the Clean Water Act in the permitting process, I would affirm on that basis the district court’s judgment vacating the permits. Thus, I respectfully dissent from the majority’s decision to the contrary. Although the district court made some misstatements of law in its CWA analysis, I believe they are harmless error and that the record contains a sufficient basis to affirm the judgment.[1] I would affirm the district court’s disposition of the CWA claim because the Corps erred (i) by failing to apply the presumption of practical alternatives and (ii) by relying on the Larsen report to establish an absence of practical *1366 alternatives without undertaking independent verification of its accuracy.[2]
The pertinent CWA regulations prohibit granting § 404 permits if “there is a practical alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.” 40 C.F.R. § 230.10(a). A presumption that practical, environmentally preferable alternatives exist arises if the “activity associated with a discharge which is proposed for a [wetland] does not require access or proximity to or siting within the [wetland] in question to fulfill its basic purpose (ie. is not water dependent).” 40 C.F.R. § 230.10(a)(3). The presumption that practical, environmentally preferable alternatives exist applies until the proponent of the discharge “clearly demonstrate^] otherwise.” Id Further, all practical alternatives to discharge in wetlands are presumed to have less adverse impact, unless clearly demonstrated otherwise. Id Thus, where the presumption applies, the permit applicant bears the burden of providing “detailed, clear, and convincing information proving that an alternative with less adverse impact is impracticable.” Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1269 (10th Cir.2004).[3] Further, such information provided by a permit applicant must be independently verified by the Corps. Id
Given the language of the regulation, a correct statement of the project’s “basic purpose” affects whether the presumption of practicable alternatives applies, and thus the extent of the applicant’s burden. See Nat’l Wildlife Federation v. Whistler, 27 F.3d 1341, 1345 (8th Cir.1994) (determining project purpose is “central” to practicable alternatives analysis). The Corps has discretion to characterize the project’s basic purpose in the first instance, including whether to accept or reject the applicant’s characterization of that purpose. In so doing, the Corps must take the applicant’s goals and purposes into account. Louisiana Wildlife Federation v. York, 761 F.2d 1044, 1048 (5th Cir.1985). But “an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable.” Sylvester v. U.S. Army Corps of Engineers, 882 F.2d 407, 409 (9th Cir.1989). If an applicant did so and the Corps adopted the applicant’s characterization of the project’s purpose, the Corps would have abused its discretion.
In other words, the question is how specifically to construe the project’s basic purpose. In its Record of Decision, the Corps stated that the basic purpose of this project is to “extract limestone,” but the overall project purpose is to provide “construction-grade limestone from MiamiDade County.” In the language of the regulation, the “activity associated with the discharge,” limestone mining, does not require “siting within the [wetland] in question to fulfill its basic purpose,” extracting limestone. See 40 C.F.R. § 230.10(a)(3). Limestone mining in general is not water-dependent. Cf. National Wildlife Federation v. Norton, 332 F.Supp.2d 170, 186 n. 13 (D.D.C.2004). Neither does securing a limestone supply from South Florida require the project to be situated in wetlands, as there are other *1367 deposits of limestone located in south Florida.[4] It is only mining this particular limestone that would require the project to be situated in wetlands.
The district court concluded that the Corps, following the lead of the mining companies, construed the project’s purpose in an artificially narrow fashion to avoid the presumption of practical alternatives, thereby abusing its discretion. I agree. The Corps effectively construed the project’s basic purpose as mining this limestone out from underneath these wetlands. So construed, a conclusion of water-dependency is inevitable. But such a site-specific formulation of a project’s purpose could no doubt be formulated for every permit application, and routine acceptance of such formulations would emasculate the wetlands-protecting presumption, defeating its purpose. Moreover, such a site-specific formulation of a project’s basic purpose appears inconsistent with the Corps’ formulation of project purposes in other cases. Two simple examples illustrate the point. When an applicant seeks to build houses with boat docks, his project’s basic purpose is to build housing, which need not occur on wetlands. (The boat docks are incidental to the basic purpose.) Shoreline Assoc. v. Marsh, 555 F.Supp. 169 (D.Md.1983), aff'd. 725 F.2d 677 (4th Cir.1984). In contrast, when a project’s basic purpose is only to build a boat dock, it is water-dependent. Whistler, 27 F.3d at 1345-46. A project is not water-dependent simply because an applicant asks to do it on wetlands, but only where it literally cannot be done elsewhere.
Of course, limestone mining has to occur where limestone deposits are. So if the Lake Belt contained the only deposits in south Florida, then perhaps a conclusion of water-dependency would be justified. But even assuming that limestone sources from other states and nations are irrelevant to the alternatives analysis, it is conceded that there are limestone deposits elsewhere in south Florida. In my view, that ends the water-dependency issue, regardless of whether the other deposits are inaccessible or of inferior quality. The Corps formulated the project’s purpose as simply extracting limestone, or as securing a limestone supply from south Florida. Plainly, there are potential alternative sites to achieve these purposes.[5] If those alternatives are infeasible, the mining companies should be able to make their case that there are no practical, environmentally preferable alternatives. But they should have to bear the higher burden of proof necessary to rebut the presumption of practical alternatives in so doing. In my view, the Corps’ failure to apply that presumption warranted summary judgment against it on the CWA claim.
Regardless of whether the presumption applies, I would also hold that the Corps erred in relying on the Larsen Report to establish the absence of practical alternatives without independent verification. The Larsen Report was a study prepared by a consultant to the mining industry, and *1368 it was the primary source relied upon by the Corps in concluding that no practical alternatives existed to mining in the Lake Belt. Many of its conclusions are repeated nearly verbatim in the Record of Decision. There is no indication in the record that the Corps independently verified the information or conclusions in the Larsen Report. Meanwhile, appellees have challenged the report as biased, arguing that the data underlying it is self-serving and provided by mining company officials, rather than gleaned from independent evaluations of the market for limestone products.
The district court, correctly in my view, concluded the Corps erred by relying on the Larsen Report without undertaking independent verification of its reliability, or at least explaining on the record why, in its expert judgment, it considered the Report’s conclusions reliable. The Corps does not err simply because it relies on data submitted by a permit applicant. See, e.g., Friends of the Earth v. Hintz, 800 F.2d 822, 834-35 (9th Cir.1986). Indeed, an applicant will frequently be the only party with an incentive to develop such data. Moreover, since the applicant is seeking to obtain a discretionary benefit from the government, it is appropriate for it to bear the cost of developing the data necessary to justify its proposal. But as the cases also reflect, when information submitted by an interested party is “specifically and credibly challenged as inaccurate, the Corps has an independent duty to investigate.” Van Abbema v. Fornell, 807 F.2d 633, 642 (7th Cir.1986); see also heater Yellowstone Coalition, 359 F.3d at 1269. It is arbitrary and capricious for an agency to rely on such challenged submissions without undertaking some form of independent verification or evaluation. The Corps’ own regulations require as much,[6] and an agency’s failure to follow its own regulations and procedures is arbitrary and capricious. See, e.g., Simmons v. Block, 782 F.2d 1545, 1550 (11th Cir.1986) (citation omitted). Courts demand independent verification not to encourage duplication of effort, but to ensure that the Corps’ decision-making process is reliable and that deference is afforded to the Corps only where its expertise is meaningfully implicated in the decision to adopt an applicant’s conclusions.
Of course, the Corps retains its customary discretion in determining the scope and depth of independent verification when it is required, or in explaining why independent verification is unnecessary. For example, in some cases an applicant-submitted report may have indicia of reliability within its four corners, or the challenge to its accuracy may not be credible. Nonetheless, the Corps’ discretion is not unbounded; a reviewing court must be satisfied that the agency made a reasoned decision. A conclusory decision to place decisive reliance on contested data submitted by an interested party is not reasoned, and therefore deserves no deference. Yet that appears to be what happened here.
To be clear, I express no view on the accuracy of the Larsen Report. Neither this court nor the district court is equipped to decide that question; the Corps is. The Larsen Report may well be scrupulous and fair. But for all the Corps has explained in the record, it is a classic hired-gun *1369 expert report painted over with a thin veneer of rigor.[7] Because plaintiffs raise non-frivolous arguments, unaddressed by the Corps, that the Larsen Report is biased in favor of the mining industry, and because that Report was the primary basis upon which the Corps justified its finding that no practical alternatives exist, I agree with the district court that the Corps acted arbitrarily and capriciously in concluding that no practical alternatives exist, and thus in granting the permits. In my view the Corps should, at a minimum, explain on the record why the conclusions about alternatives reached by the Larsen Report are reliable, if the Corps believes them to be so, and why the Corps adopted them. Independent verification by the Corps would be preferable and may be required in the circumstances, although I need not reach that issue because the Corps has made neither an explanation nor an investigation.
In short, I would affirm the district court’s grant of summary judgment on the Clean Water Act claim. Having determined that the permits were unlawfully issued, I would also conclude that the district court did not abuse its discretion in its remedial decisions, namely (i) in vacating the permits, and (ii) in refusing to stay its vacatur order as to a portion of the mining area closest to Miami’s Northwest Wellfield. I agree, as have most other courts, that the mining companies’ desired remedy of remand without vacatur is within a reviewing court’s equity powers under the APA.[8] But in deciding whether to remand without vacatur, it is appropriate to consider the balance of equities and the public interest, along with the magnitude of the agency’s errors and the likelihood that they can be cured. See, e.g., Central Me. Power Co., 252 F.3d at 48. Further, the district court received extensive evidence that mining poses a threat of contaminating Miami’s drinking water supply with benzene — evidence that apparently was not available to or considered by the Corps during the permitting process. It was not legal error to receive this evidence because once the mining companies requested relief from the typical APA remedy of vacatur, the plaintiffs were entitled to prove that the public interest militated against such relief. Nor do I discern clear error in the district judge’s thorough weighing of the evidence to conclude that mining contributed to the benzene contamination, a conclusion which relied in significant part on credibility determinations we are not in a position to disturb. See, e.g., Fischer v. S/Y NERAIDA, 508 F.3d 586, 592 (11th Cir.2007) (citations omitted) (clear error standard and deference to credibility determinations on appeal). Because vacatur of unlawful agency action is the ordinary APA remedy,[9] and because *1370 there was significant record evidence that continued mining during the remand period is contrary to the public interest, I would hold that the district court’s remedial decisions were not an abuse of discretion.
Accordingly, because I believe the permits were issued in violation of the Clean Water and Administrative Procedure Acts and the district court’s subsequent decisions were within its remedial discretion, I respectfully dissent from the judgment.

. Unlike the majority, I do not believe the district court’s statement about "cumulative” error by the Corps compels the conclusion that every error the district court committed was prejudicial. The district court elsewhere stated that there were multiple, independently sufficient grounds for summary judgment. See, e.g., Sierra Club v. Flowers, 423 F.Supp.2d 1273, 1345 (S.D.Fla.2006) (five independent NEPA inadequacies in the EIS); id. at 1356 (remand warranted by failure to apply presumption of practical alternatives); id. at 1363 (remand warranted by reliance on Larsen Report). Moreover, the cumulative error statement was itself an alternative holding: the cumulative effect of the Corps’ errors warranted remand "even if” one or two such defects would not. The cumulative error statement is too thin a reed upon which to conclude that dozens of otherwise logically independent holdings in fact are not independent, and accordingly that we cannot affirm on grounds sufficient to support the judgment notwithstanding error in the opinion.

. As the foregoing implies, I also agree with the majority’s reasoning that the Administrative Procedure Act waives federal sovereign immunity concerning challenges to CWA § 404 permits.

. This court has not had many opportunities to interpret 40 C.F.R. § 230.10(a)(3). In our only case to have done so, Fund for Animals v. Rice, 85 F.3d 535, 542 (11th Cir.1996), it appears the record was clear that no feasible alternatives existed.

. The mining companies contend these other sites are not feasible sources of limestone because they are underneath either the Everglades or urban areas, and therefore cannot be mined. But that contention addresses whether the presumption of practical alternatives has been rebutted, not whether it applies.

. Of course, limestone could also be imported from other areas in Florida as well as other states and countries, an alternative whose feasibility the parties dispute sharply. The mining companies contend that utilizing such sources would ultimately result in more environmental degradation than the instant mining plan. Again, I believe this argument addresses whether the presumption that non-wetlands alternatives will be environmentally preferable has been rebutted, not whether the presumption applies.

. More specifically, the Corps’ NEPA regulations make clear that when the Corps requires an applicant to submit data for an EIS, it must “independently evaluate the information submitted by the applicant and shall be responsible for its accuracy.” 40 C.F.R. § 1506.5(a). Moreover, the Corps’ regulations contemplate that the alternatives analysis in NEPA documents will also provide the basis for practicable alternatives analysis under the CWA. 40 C.F.R. § 230.10(a)(4). In other words, any duty to verify information submitted by an interested party will typically be the same under both statutes.

. It is worth noting that during the permitting process, officials from other federal agencies such as the National Park Service noted Larsen’s financial alignment with the mining companies and expressed (albeit informally) the view that an independent evaluation would be helpful.

. See, e.g., Chamber of Commerce v. SEC, 443 F.3d 890, 908 (D.C.Cir.2006); Central Me. Power Co. v. FERC, 252 F.3d 34, 48 (1st Cir.2001); Nat’l. Org. of Veterans’ Advocates v. Sec’y of Veterans Affairs, 260 F.3d 1365, 1380-81 (Fed.Cir.2001); Central and S.W. Services, Inc. v. EPA, 220 F.3d 683, 692 (5th Cir.2000); Idaho Farm Bureau Fed’n v. Babbitt, 58 F.3d 1392, 1406 (9th Cir.1995). But see Checkosky v. SEC, 23 F.3d 452, 490-93 (D.C.Cir.1994) (separate opinion of Randolph, J.); Milk Train, Inc. v. Veneman, 310 F.3d 747, 757-58 (D.C.Cir.2002) (Sentelle, L, dissenting.) (both arguing the practice is unlawful).

. See, e.g., Nat’l Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1409 (D.C.Cir.1998) (vacatur is the "ordinary result” under the APA for unlawful agency action).