**SITHE NEW ENGLAND HOLDINGS, LLC, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Northeast Utilities Service Company, Petitioner,**

v.

**Federal Energy Regulatory Commission, Respondent.**

**Nos. 01–1933, 01–1952 and 02–1158.**

United States Court of Appeals, First Circuit.

Heard Aug. 1, 2002.

Decided Oct. 4, 2002.

David B. Raskin with whom Charles G. Cole, Joseph E. Stubbs, Steptoe & Johnson LLP, Northeast Utilities Service Company, Frederic Lee Klein, Assistant General Counsel, Northeast Utilities Service Company, Scott G. Silverstein, Sithe Energies Inc., Richard P. Bress, Michael J. Gergen, Latham & Watkins, PG & E National Energy Group, Inc, PG & E Generating Company, LLC, USGen New England, Inc., PG & E Energy Trading Power, L.P., John N. Estes III, Paul Franklin Wight, Skadden, Arps, Slate, Meagher & Flom, Sithe New England Holdings, LLC, FPL Energy, LLC, Larry F. Eisenstat,

George E. Johnson, Dickstein Shapiro Morin & Oshinsky LLP, Duke Energy North America, LLC were on brief for petitioners.

Larry D. Gasteiger with whom Cynthia A. Marlette, General Counsel, and Dennis Lane, Solicitor, Federal Energy Regulatory Commission, were on brief for respondent.

Lisa Fink, Staff Attorney, with whom Harvey L. Reiter, Stinson Morrison Hecker LLP, Richard M. Lorenzo, Heidi M. Werntz, Huber Lawrence & Abell, Michael E. Small, Wendy N. Reed, Wright & Talisman, P.C., Robert V. Zener and Swidler Berlin Shereff Friedman, LLP were on brief for intervenors State of Maine Public Utilities Commission, Maine Public Utilities Commission and Vermont Department of Public Service, Central Maine Power Company, Bangor Hydro–Electric Company and National Grid USA.

Before BOUDIN, Chief Judge, GIBSON,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BOUDIN, Chief Judge.

In this case, a number of electric power companies that supply surplus power to other distributors petition for review of a set of orders of the FERC. The only issue, narrow but complicated, is whether FERC erred in determining that the so-called ICAP charge in New England for a thirteen-month period now past (August 1, 2000–August 31, 2001) should be held at $0.17 per kw-month rather than set at a much higher figure sought by the petitioning utilities. The case is a sequel to *Central Maine Power Co. v. FERC*, 252 F.3d 34 (1st Cir.2001).

The regulatory scheme, the history of the ICAP charge, and the pertinent prior FERC orders are described at some length in *Central Maine Power*, but a thumbnail description may be helpful. Wholesale dealing in electric power is largely regulated by FERC under the Federal Power Act. 16 U.S.C. § 791a *et seq.* (2000). Such transactions include both actual sales and standby commitments to cover shortfalls contracted for between power companies who produce more than they need and other utilities that retail power but may produce no power themselves or less than they need.

Retail utilities, called load serving entities or LSEs by FERC, have to be able to secure power to cover somewhat unpredictable peak demands (*e.g.*, an unusually hot work-week day in the summer). Yet, unless they own ample generating capacity, LSEs may have an incentive to take risks in their purchasing arrangements. Although prudence would dictate purchasing enough standby capacity from a wholesaler to ensure that peak demand can be met, this standby capacity costs money and may never be used. So, especially in the face of growing retail competition, LSEs may skimp in purchasing reserve capacity.

In the short run, whatever productive capacity already exists in the generating industry will be available to bail out the LSEs that failed to purchase enough reserve capacity; but over the long run, producers may not invest enough in new plants merely to protect imprudent LSEs. FERC has been concerned enough about this danger to insist that LSEs buy, through advance contracts with wholesalers, enough reserve capacity to cover their peak needs; and FERC has backed up that insistence with the ICAP charge.

The ICAP charge has varied in level and structure over time and in different re-

---

* Honorable John R. Gibson, of the Eighth Circuit, sitting by designation.

gions, *Cent. Me. Power Co.*, 252 F.3d at 39–40, 43 & n. 5, but the gist of the charge is simple. Each LSE is assigned capacity obligations based on projected peak load. Any LSE that fails during a given period to purchase enough reserve capacity to cover that peak load obligation must pay a so-called installed capacity deficiency charge ("ICAP"); the charge is a fixed kw-month charge, which is then multiplied by the size of the LSE's particular deficiency during the period.

From 1990 to 1998, the ICAP charge in New England was $8.75 per kw-month. Supposedly, this amount represented the amortized cost of constructing new facilities to generate one peaking unit of electricity ($6) plus a penalty ($2.75). *Cent. Me. Power Co.*, 252 F.3d at 39 & n. 2. During this period, the proceeds from the ICAP charge were shared among those wholesale suppliers of electricity that had excess capacity. The ICAP payments to wholesaling utilities were over and above their ordinary charges to LSEs for power actually supplied and for any reserve capacity purchased in advance.

In 1998 and 1999, FERC discontinued the fixed ICAP charge, allowing the level to be set according to a so-called auction market. The charge then fell so drastically, possibly because the market was manipulated, that FERC by order of June 28, 2000, discontinued the auction approach and ordered the New England utilities to propose within 30 days an "appropriate" ICAP charge. *ISO New Eng., Inc.*, 91 FERC ¶ 61,311, at 62,081–82, 2000 WL 863242 (2000). ISO–NE, the entity that represents the utilities in this process but is apparently dominated by purchasing LSEs, responded by proposing a new charge of $0.17 per kw-month, a figure derived from average payments under the now-discredited auction regime.

There ensued the events recounted in detail in *Central Maine Power*. Understandably angry at the $0.17 proposal and spurred by rehearing requests from the wholesale suppliers, FERC issued an order on December 15, 2000, that directed the reinstatement of the original $8.75 figure, retroactive to August 1, 2000, *ISO New Eng., Inc.*, 93 FERC ¶ 61,290, at 61,-975, 2000 WL 1840335 (2000). On reconsideration, by order of March 6, 2001, FERC reaffirmed the figure but said that it would be made effective only from April 1, 2001, the $0.17 figure being left to govern the period between August 1, 2000, and the new effective date. *ISO New Eng., Inc.*, 94 FERC ¶ 61,237, at 61,947, 2001 WL 275399 (2001).

The purchasing utilities sought review of the $8.75 charge in this court, backed by state utility commissions, and on March 30, 2001, secured a stay from this court prohibiting any ICAP charge exceeding $0.17. FERC then entered its own stay. Our stay was based in part on apparent gaps in FERC's reasoning in support of the $8.75 charge and in part on forecasts (which were overstated) of huge ICAP payments and consequent rate increases for consumers. Following expedited review, we remanded to FERC for further explanation on several issues but vacated our stay, specifically permitting the $8.75 increase to go into effect at once.

FERC, which had opposed the court stay vigorously, nevertheless declined to re-implement the $8.75 charge. Instead, it conducted further proceedings and on August 28, 2001, accepted an ISO–NE filing setting a new ICAP charge at $4.87, effective September 1, 2001. *ISO New Eng., Inc.*, 94 FERC ¶ 61,237, at 61,944–45, 2001 WL 1825713 (2001). FERC directed that the proceeds should go to utilities that purchased adequate reserves and not just to the suppliers of reserve capacity. *Id.* at

61,945. This August 28 order, which is not before us, bypassed the issue of past obligations for deficiencies between August 1, 2000 and September 1, 2001.

Instead, FERC dealt with past obligations in an order of September 28, 2001, *ISO New Eng., Inc.*, 96 FERC ¶ 61,359, 2001 WL 1154525 (2001), assertedly responding to this court's remand in *Central Maine Power.* Principally, the order addressed the questions we had posed in our remand order: FERC said that a substantial ICAP charge was required, that the validity of the $8.75 charge had been mooted by adoption of the $4.87 charge, and that suggested alternatives to ICAP were inadequate. Then, FERC affirmed that the deficiency charge from August 1, 2000, to August 31, 2001, should remain at $0.17.

The conclusion had been foreshadowed by FERC's earlier refusal in its March 6, 2001, order to make the $8.75 charge retroactive from August 1, 2000 to April 1, 2001. Now elaborating in the September 28, 2001, order, FERC said that a retroactive increase from August 1, 2000, to September 1, 2001, was forbidden by this court's remand order and, in any event, was unjustified on policy grounds (which we describe below). The purpose of the petitions for review in the case now before us is to challenge that conclusion and to secure for petitioners ICAP payments for that thirteen-month period at a level exceeding $0.17.[1]

In this court, petitioners assert that FERC was obligated by statute to award larger ICAP payments for the past period (preferably $8.75) and, the statute aside, that its failure to do so rests on flawed reasoning. FERC defends its refusal on grounds already mentioned, namely, that

the request is precluded alike by this court's remand order and by policy. The intervenors—who are state regulators and purchasing utilities—defend FERC and go further, asserting that the statute would bar a "retroactive" increase even if FERC desired it.

We put aside at the outset FERC's claim that its result is dictated by our remand order. After staying and then reviewing the $8.75 charge, we held in *Central Maine Power* that the charge had not been adequately justified; but we concluded that on remand FERC could probably close the gaps in its reasoning and that public interest concerns justified allowing FERC to implement immediately, even before the remand proceedings were complete, the higher ICAP charge it had already adopted. We ended our decision as follows:

> [O]ur prior stay order barring the $8.75 charge is vacated forthwith [*i.e.*, without awaiting issuance of the mandate], and FERC is free to re-impose its $8.75 charge prospectively, either at once or as of some specified future date.

*Id.* at 48.

FERC has asserted in its September 28 order and elsewhere that our use of the word "prospectively" precludes it from mandating an ICAP charge for the past that is higher than $0.17. That misreads our remand order, as FERC ought to have known (if in doubt, it could easily have sought clarification). Indeed, even as read by FERC, the remand order could hardly have required a denial of higher charges for the period after June 8, 2001, the date of our order.

---

1. The petitions challenge in pertinent part not only the September 28, order, but also three prior orders (January 10, 2001, March 30, 2001, and May 4, 2001) and a subsequent order of December 21, 2001, denying reconsideration of the September 28, order. For present purposes, we need not distinguish among the orders.

In all events, the word "prospectively" was used in our order because we were authorizing the immediate imposition of the $8.75 charge—based on concerns about assuring *future* supply—even though its final validity had not yet been determined. We said "prospectively" because higher payments for any past period would have made no sense while the permissible level was still in dispute. The question whether a higher charge (if ultimately upheld) could or should be made retroactive was not briefed in the appeal or discussed in the opinion, so certainly it was not decided by a one-word reference.

We turn then to the statutory questions now posed: whether an increased ICAP charge (be it $8.75 or $4.87) *must* be made retroactive, as petitioners contend or whether, as intervenors argue, the statute *forbids* FERC from ordering a so-called retroactive refund. Both positions are wrong. And, as FERC does not adopt either side's statutory reading, we need not consider how much deference would be due to its construction if the court and agency differed over how to read the statute.

■ At issue are the classic utility rate-making provisions of the Federal Power Act, long employed for cost-of-service rate-making.[2] Federal deregulation in the energy field (only partial to be sure) has required the agency and the courts to address issues, and contrive solutions, never anticipated by the drafters. In any event, many of the general statements in older decisions, including the slogans pressed by both sides, were always subject to qualification. We begin with petitioners' claim of entitlement to the higher ICAP charge as a "just and reasonable" rate.

In a nutshell, petitioners say that FERC, having rejected the $0.17 charge as of August 1, 2000, was obliged by the Federal Power Act to fix a new ICAP charge at a just and reasonable level from that time forward and to ensure payment of such an amount to selling utilities. They argue in effect that forcing FERC to order additional ICAP payments for the thirteen-month period now in dispute, based on the $8.75 level ordered on December 15, 2000, would merely give the sellers their entitlement determined at that time but never implemented.

This outcome, the petitioners say, is compelled by the Federal Power Act. The language most congenial to petitioners provides that whenever the agency finds a rate unlawful, it "shall" determine the just and reasonable rate "to be thereafter observed ... and shall fix the same by order." 16 U.S.C. § 824e(a). And, of course, case law echoes this language, *e.g.*, *Northeast Utils. Serv. Co. v. FERC*, 55 F.3d 686, 687 (1st Cir.1995), although not in any context involving ICAP charges. There are at least two problems with petitioners' argument; the first is useful to note and the second is fatal.

■ Broadly speaking, selling utilities are entitled to implement just and reasonable charges, although they can be delayed, 16 U.S.C. § 824d(e), and in a competitive market sellers may not always be able to collect such charges. *Mkt. St. Ry. Co. v. R.R. Comm'n*, 324 U.S. 548, 566–67, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). But the statute does not directly tell FERC or the courts what to do where, for some *past* period, a FERC error has prevented a seller from implementing a higher rate.

---

**2.** The Federal Power Act was, like similar federal utility and carrier statutes (*e.g.*, the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, and the Natural Gas Act of 1938, 15 U.S.C. 717 *et seq.*, adapted from the original, now defunct, Interstate Commerce Act of 1887, 24 Stat. 379, directed at railroad regulation).

The seller might conceivably be allowed to implement that higher rate "retroactively" despite the intervenors' contrary argument (which we discuss further below), but that is a far cry from saying that the statute compels FERC to order such retroactive adjustments.

In some circumstances, it might well seem fair to order such increases for a past period and at least consistent with the statute's aim, although not necessarily compelled by specific language: remember that the quoted statutory language related to fixing rates for the future, not the past. But not in all circumstances: imagine a case where the buyers were ultimate consumers who had relied on the (erroneous) existing charge. The problem is complicated and petitioners' general assumption of entitlement is debatable even in the case of ordinary rates.

■ But the problem need not be pursued because even on petitioners' own assumption, they are fatally wrong in thinking that ICAP is any part of a supposed statutory entitlement. The classic just and reasonable rate—which utilities were entitled to implement, *cf. Mkt. St. Ry. Co.*, 324 U.S. at 566–67, 65 S.Ct. 770—is a rate that allows for revenues that compensate carriers for their investment and expenses, not necessarily for the individual service but (taken together with revenues from all of their rates) for their services as a whole. *See Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 614–15, 64 S.Ct. 281, 88 L.Ed. 333 (1944). In this instance, the rates that perform this office are the rates that petitioners charge when they sell their surplus power or sell stand-by rights assuring access to that power.

■ The ICAP charge, by contrast, is not of this ilk. Rather, it is a payment to suppliers *over and above* the amount they charge for power sold to or reserved for buyers. Its aim is not private compensation for past investment; instead, it is designed to serve two different public purposes: one is to give providers an extra incentive to construct new plants and the other—this time the stick rather than the carrot, *see, e.g., ISO New Eng., Inc.*, 94 FERC ¶ 61,237, at 61,942, 2001 WL 1825713 (2001)—is to impose a hefty penalty on those buyers who fail to acquire the reserve capacity that FERC has decreed they shall have.

■ It is true that ICAP charges are tariffed—not by the sellers but by ISO-NE—and that FERC uses the "just and reasonable" rubric in regulating them, but they are simply not part of the compensation to sellers required by the statute. If ICAP charges were abolished by FERC tomorrow, the sellers could object that FERC was behaving unreasonably in its "on and off" regulatory policies but not that they were deprived of a just and reasonable rate. Sellers can still charge the just and reasonable rate for whatever power they sell to buyers or reserve for them.

This brings us to intervenors' claim that FERC could not impose the higher charge (be it $4.87 or $8.75) "retroactively" even if it wanted to do so. It is worth puncturing that balloon as well since this could easily be a recurring issue. There are indeed limits on "retroactive ratemaking"; but this is a slogan even more abused than petitioners' claims of entitlement to a just and reasonable ICAP rate. (It is further confused by invocations of a companion notion—the so-called "filed rate doctrine," a phrase that covers more than one precept.[3])

---

**3.** *See, e.g., Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (explaining that the filed rate doctrine prohibits a regulated entity from charging

■ If the phrase "retroactive ratemaking" is used in a lay sense, there are limits on retroactive ratemaking but no universal ban. For example, every time that FERC or any comparable agency decides that an existing rate is unjust and orders refunds to buyers for a past period, it is engaging in permissible "retroactive ratemaking" in a vernacular sense. What is primarily restricted by the statute—although this is not a complete catalogue—is for the agency to surprise buyers, who paid the tariffed rate for a service, by telling them that they must now pay an increased price for past services.

If we had to adapt this restriction to the present case, it would not necessarily protect intervenors if FERC chose to make them pay higher ICAP charges for the period from August 1, 2000, to September 1, 2001. Buyer utilities were told prior to August 1, 2000, that an appropriate ICAP charge would be reinstituted as of that date (and knew that the last appropriate fixed charge as of 1998 was $8.75). Collectively, the buyers chose instead to file the derisory $0.17 charge, borrowed from the auction regime that FERC had just found to be flawed and had ordered replaced.

■ Given FERC's June 28, 2000, order and the state of the buyers' knowledge as of August 1, 2000, few would think it unfair, let alone surprising, if FERC had chosen to insist—after it fixed the final figure ($4.87)—that the buyers pay that amount for the intervening period. *Cf. Exxon Co., U.S.A. v. FERC,* 182 F.3d 30, 47–50 (D.C.Cir.1999); *Pub. Utils. Comm'n v. FERC,* 988 F.2d 154, 161–62 (D.C.Cir. 1993). We are not here concerned with

the final consumers of power but of transactions between experienced utilities. Had FERC ordered increased payments for the past period, its order could not be brushed off simply by invoking the mantra that retroactive ratemaking is not permitted.

Assuming (as we emphatically do) that FERC could lawfully have implemented higher ICAP charges for the past period, we must now deal with petitioners' quite separate claim that FERC's reasons for refusing to do so were irrational. This is, in fact, a perfect example of a choice with reasonable policy arguments on both sides, so that the agency's choice easily controls so long as it adequately explains its position. *M/V Cape Ann v. United States,* 199 F.3d 61, 63–64 (1st Cir.1999). That is just what it has done.

As FERC pointed out, an award of higher ICAP charges for a past period obviously cannot alter the utilities' behavior in that period. *ISO New Eng., Inc.,* 94 FERC ¶ 61,237, at 61,847, 2001 WL 275399 (2001). Recall our earlier observation that ICAP is not devised to compensate past investment but to spur sellers to make new investment and buyers to meet their reserve capacity obligations (which indirectly has a similar effect). Absent time travel, whatever investment decisions sellers made prior to September 1, 2001, are history, and so too are the risks taken by buyers who did not purchase adequate reserves for that period.

Of course, some benefits could be served by higher payments for the past. Sellers could use any funds they now receive for new investment, although in principle this

---

rates for its services "other than those properly filed with the appropriate federal regulatory authority"); *Town of Norwood v. FERC,* 217 F.3d 24, 28 (1st Cir.2000) (stating that the doctrine has evolved over time but is based on the notion that "utility filings with the regula-

tory agency prevail over unfiled contracts or other claims seeking different rates or terms than those reflected in the filings with the agency"), *cert. denied,* 532 U.S. 993, 121 S.Ct. 1653, 149 L.Ed.2d 636 (2001).

should not alter their forward-looking decision as to whether an investment will be profitable. More plausibly, a payment for the past might underscore FERC's commitment to future ICAP payments, and ICAP stability could affect future investments; but no wise seller, given FERC's own track record of about-faces on ICAP charges and its present openness to future changes, *see ISO New Eng., Inc.*, 94 FERC ¶ 61,237, at 61,942–43, 2001 WL 1825713 (2001), could rely very heavily on this indirect signal.

Based on the present record, the policy choice could go either way; indeed, a tyro could write a plausible agency opinion either way. The benefits of ordering increased payment for the past are real but limited; it is unclear how much ultimate consumers might be helped or burdened by such an action; and for the utilities immediately concerned, the money is largely a windfall whether it is kept or paid. Decisions of this kind are grist for the agency mill, and in this instance there is no basis for a court to substitute its own view.

If there is cause for misgivings, it is that FERC's own opinion is one-sided and scarcely addresses the policy arguments "for" ordering a higher retroactive payment although they are obvious anyway. But it got the "against" arguments about right and showed some balance in eschewing the intervenors' statutory argument. A court needs a practical sense as to when further proceedings would be useful (our remand in *Central Maine Power* did alter the amount of the future charge) and when they would be a waste of time.

The petitions for review are *denied.*