Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the
Clerk of any formal errors in order that corrections may be made before the
bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 11, 2005          Decided May 13, 2005

No. 03-1449

ELECTRICITY CONSUMERS RESOURCE COUNCIL,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., ET AL.,
INTERVENORS

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

*Sara D. Schotland* argued the cause for petitioner. With her on
the briefs was *Robert A. Weishaar, Jr.*

*Lona T. Perry*, Attorney, Federal Energy Regulatory
Commission, argued the cause for respondent. With her on the brief
were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*,
Solicitor.

*Jonathan D. Feinberg* was on the brief for intervenor Public

Service Commission of the State of New York.

*William F. Young* and *Susan E. Dove* were on the brief for intervenor New York Independent System Operator, Inc. *Arnold H. Quint* entered an appearance.

*Frederick W. Morris*, *James J. Bertrand*, *Brian M. Meloy*, *Debra R. Bolton*, *Scott G. Silverstein*, *Mary M. Fabic*, and *Kenneth R. Carretta* were on the brief for intervenors NRG Companies, et al.

Before: SENTELLE, ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The Electricity Consumers Resource Council ("ELCON") challenges two orders of the Federal Energy Regulatory Commission approving a rate design for the installed capacity market administered by the New York Independent System Operator, Inc. ("NYISO"). *See NY Indep. Sys. Operator, Inc.*, 103 F.E.R.C. ¶ 61,201 (2003) ("*Initial Order*"); *NY Indep. Sys. Operator, Inc.*, 105 F.E.R.C. ¶ 61,108 (2003) ("*Rehearing Order*"). While maintaining that the Commission's orders violate both the "just and reasonable" ratemaking standard of the Federal Power Act ("FPA"), 16 U.S.C. § 824d(a) (2000), and the arbitrary and capricious standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (2000), ELCON urges a heightened standard of review for "incentive ratemaking" requiring the Commission to demonstrate that the rate increase is no more than necessary to achieve its purpose of encouraging investment in new generation facilities in New York State. Because we conclude that the rate design does not impose an incremental rate increase above traditional cost-based rates but rather seeks to stabilize rates to promote the development and retention of installed capacity, there is no basis for applying a heightened standard of review. Upon applying the usual APA standard, we conclude that

the Commission's approval of the rate design is supported by substantial evidence in the record and is not otherwise arbitrary and capricious. Accordingly, we deny the petition for review.

**I.**

To prevent electricity shortages during periods of peak demand, the New York State Reliability Council required retail utilities, known as load serving entities ("LSEs"), to purchase installed capacity ("ICAP") equal to 118% of their peak loads. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,750. If an LSE failed to procure the required amount of ICAP through its own supply or through bilateral contracts, it was required to purchase the deficient quantity through NYISO auctions, at which the price equaled a "deficiency charge" of $255 per kilowatt-year, or three times the annualized cost of installing a new "peaker" power plant. *See id.* This rate design resulted in a vertical demand curve for ICAP, with the price equal to $255 for all quantities up to 118%, and $0 for all quantities exceeding 118%.

Figure 1: Vertical Demand Curve

4

*See id.* & fig.1. According to NYISO, the vertical demand curve caused extreme volatility in ICAP prices, thus discouraging investment in new generation facilities and creating "the potential for a capacity deficiency" in New York State. *Id.* at 61,751.

To address this problem, NYISO applied to the Commission for approval of amendments to its tariff to incorporate a new rate design replacing the vertical demand curve with a sloped "ICAP Demand Curve," which would be used in monthly auctions to determine both the quantity and price of required ICAP. *See id.* For 118% of peak load, the price would equal the annualized cost of a new peaker plant. *See id.* As supply increased above 118%, the price would gradually decrease until it reached zero for 132% of peak load, and as supply decreased below 118%, the price would gradually increase until it reached a maximum of two times the annualized cost of a new peaker plant. *See id.* & fig.2.

Figure 2: Sloped ICAP Demand Curve



Each month, capacity suppliers, including LSEs with excess capacity, would bid into an ICAP auction and create the supply curve; the point of intersection between the supply curve and the ICAP Demand Curve would determine the quantity and price of required ICAP. *See id.* at 61,752. If the monthly auction yielded a quantity less than 118% of peak load, NYISO would purchase the deficient amount outside the auction market and charge each LSE a "supplemental supply fee" equal to 1.5 times the annualized cost of a new peaker plant. *See id.* at 61,753. NYISO also proposed a "periodic independent review of the Demand Curve every three years to determine whether adjustments are warranted." *Id.*

ELCON, which represents industrial consumers of electricity, intervened and protested the new rate design, arguing that it would increase electricity prices for consumers without spurring investment in new generation capacity, and that it violated incentive ratemaking case law because the ICAP Demand Curve was not carefully calibrated to increase investment in new generation facilities without granting a windfall to existing capacity suppliers. The Commission approved NYISO's rate design with modifications, finding that it would "benefit customers because it [would] provide better price signals to investors for construction of new generation, encourage the formation of long-term bilateral transactions, and reduce incentives to withhold capacity." *Id*. at 61,750. The Commission agreed with NYISO that the ICAP Demand Curve would "encourage greater investment in generation capacity and thus improve reliability, by reducing the volatility of ICAP revenues," and concluded that it would "provide net benefits especially compared with the existing vertical demand curve." *Id.* at 61,753-54. The Commission eliminated the supplemental supply fee based on the concern that suppliers would withhold capacity from the monthly ICAP auction in order to sell capacity at the higher price of the supplemental supply fee. *See id.* at

61,761. Characterizing the ICAP Demand Curve as "a novel proposal" requiring "some measure of judgment" in setting the specific parameters, and observing that it "will be important to evaluate and monitor the appropriateness of these parameters after some experience is gained," the Commission required NYISO to file "a detailed evaluation of the Demand Curve and its implementation by December 1, 2003, and annually for two years thereafter." *Id.* at 61,754. The Commission denied ELCON's petition for rehearing and approved NYISO's proposal to set the supplemental supply fee equal to the monthly ICAP auction price. *See Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,625. This petition for review followed.

## II.

The court ordinarily reviews the Commission's orders to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Pub. Utils. Comm'n v. FERC*, 254 F.3d 250, 253-54 (D.C. Cir. 2001). Such review is limited to whether the Commission has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Specifically, "our review of whether a particular rate design is 'just and reasonable' is highly deferential" because "[i]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission." *Pub. Utils. Comm'n*, 254 F.3d at 254 (alteration in original) (quoting *Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999)) (internal quotation marks omitted). The Commission's factual findings are conclusive if supported by substantial evidence in the record, 16 U.S.C. § 825*l*(b), and the court defers to the Commission's

resolution of factual disputes between expert witnesses, *see Wisc. Valley Improvement Co. v. FERC*, 236 F.3d 738, 746-47 (D.C. Cir. 2001).

ELCON contends that the challenged orders are subject to a heightened standard of review because the ICAP Demand Curve is neither market-based nor cost-based but rather administratively constructed to encourage investment in new generation capacity. According to ELCON, the Commission must demonstrate that such "incentive ratemaking" is "in fact needed, and is no more than is needed, for the purpose." *City of Detroit v. Fed. Power Comm'n*, 230 F.2d 810, 817 (D.C. Cir. 1955). In support of this heightened standard of review, ELCON cites a line of cases involving the Commission's approval of incremental rate increases above cost-based rates to encourage increases in energy supply. *See, e.g.*, *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1503 (D.C. Cir. 1984); *City of Charlottesville v. FERC*, 661 F.2d 945, 950 (D.C. Cir. 1981); *Pub. Serv. Comm'n v. FERC*, 589 F.2d 542, 552-53 (D.C. Cir. 1978); *City of Detroit*, 230 F.2d at 817-818. ELCON also cites the Commission's 1992 Policy Statement on incentive ratemaking, which states that the Commission "is free to set rates [above cost-based rates] to provide incentives so long as there is a correlation between the incentive and the result to be induced." *Incentive Ratemaking for Interstate Natural Gas Pipelines, Oil Pipelines, and Electric Utilities*, 61 F.E.R.C. ¶ 61,168, 61,594 (1992). ELCON maintains that the new rate design violates the incentive ratemaking case law and the 1992 Policy Statement because it offers increased revenues to all capacity suppliers, regardless of whether they invest in new generation facilities. In ELCON's view, the new rate design grants a windfall to existing capacity suppliers at the expense of LSEs and their customers.

In the *Initial Order*, the Commission explained that the

incentive ratemaking cases and the 1992 Policy Statement were inapplicable to the ICAP Demand Curve because they "involved incremental rate increases levied upon all customers," whereas "ICAP charges are not automatically applied to every sale of power, and they can be avoided by self-supplying or procuring adequate capacity through bilateral contracts." *Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,755. On rehearing, the Commission further explained that although the incentive ratemaking cases "involved proposals to encourage new supplies, as does New York's ICAP Demand Curve, they were implemented as different types of rates than the instant one and with a different potential impact on ratepayers." *Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,620. While the Commission does not explore this difference in detail, the court can "discern a reasoned path" to the Commission's conclusion, *E. Tex. Elec. Coop., Inc. v. FERC*, 218 F.3d 750, 755 (D.C. Cir. 2000), because the intervening capacity suppliers lay out that path in detail in their brief.

Unlike incentive ratemaking, the ICAP Demand Curve does not impose an incremental rate increase above traditional cost-based rates. "For the rationale of the incentive rate cases to apply here," the intervening capacity suppliers explain, ELCON "would need to identify a 'rate increase' over and above the rates permitted under the Vertical Demand Curve — rates that [ELCON] concede[s], at least implicitly — fall within the 'zone of reasonableness' under the just and reasonable standard." Br. of Supplier Intervenors at 8. Under the vertical demand curve, ICAP prices ranged from zero to the deficiency charge, or three times the annualized cost of a new peaker plant. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,750. Under the sloped demand curve, ICAP prices range from zero to two times the annualized cost of a new peaker plant. *See id.* at 61,751. At quantities above 118% of peak load, ICAP prices are higher under the sloped demand curve than under the vertical demand

curve, but at quantities equal to or below 118%, ICAP prices are lower under the sloped demand curve than under the vertical demand curve. *Compare id.* at 61,750 fig.1 *with id.* at 61,751 fig.2. Thus, the intervening capacity suppliers point out, the sloped demand curve does not impose an incremental rate increase.

More important, unlike incentive ratemaking, the ICAP Demand Curve encourages investment in new generation capacity by ensuring "increased stability in ICAP revenues," not higher rates across the board. *Id.* at 61,758. Instead of granting "above-cost premiums to suppliers of capacity," Br. of Resp't at 26, the ICAP Demand Curve restructures ICAP prices to "more realistically reflect[] the economic value of capacity reserves" and to "send better price signals to encourage the construction of generation before a shortage occurs." *Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,756-57. In the Commission's view, stable ICAP revenues will reduce the risk and cost of financing investment in new generation capacity and thus reduce the cost of electricity to consumers in the long term. *See id.* Its conclusion is supported by substantial evidence in the record. *See infra* Part III.

Insisting that the ICAP Demand Curve imposes excessive incentive rates, ELCON relies on two decisions of the First Circuit: *Central Maine Power Co. v. FERC*, 252 F.3d 34 (1st Cir. 2001), and *Sithe New England Holdings, LLC v. FERC*, 308 F.3d 71 (1st Cir. 2002), which address ICAP charges similar to those here. In *Central Maine*, the Commission had initially imposed a deficiency charge equal to $8.75 per kilowatt-month based on the amortized cost of a new peaker plant, and then later abandoned the deficiency charge in favor of an ICAP auction market. *See* 252 F.3d at 39. After the ICAP auction market proved a failure, the Commission reinstated the $8.75 deficiency charge without responding to objections that it was no longer

necessary to encourage investment in new generation capacity and that the cost of a new peaker plant had since decreased. *See id.* at 39-45. Although the First Circuit remanded the case for the Commission to explain its reinstatement of the deficiency charge, *see id.* at 47-48, it did not, contrary to ELCON's suggestion, require the Commission to demonstrate that the $8.75 charge was no more than necessary to encourage investment in new generation capacity. The court did not cite the incentive ratemaking cases and in fact suggested a deferential standard of review, stating that "[i]f FERC had provided even a semblance of serious discussion as to why a substantial ICAP charge was still required and why the preexisting figure was the best solution on short notice, quite probably the charge would be sustained outright." *Id.* at 44. In *Sithe*, which was "a sequel to *Central Maine*," 308 F.3d at 73, the issue was whether the FPA required the Commission to apply the reinstated deficiency charge retroactively. *Id.* at 76. As ELCON points out, the First Circuit explained that the deficiency charge was not a "statutory entitlement" but rather "an extra incentive to construct new plants." *Id.* at 77. But contrary to ELCON's contention, and as the Commission noted in the challenged orders, nowhere in *Sithe* did the First Circuit suggest that the deficiency charge was subject to the heightened standard of review articulated in the incentive ratemaking cases. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,755; *Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,620. Thus, ELCON fails to demonstrate that the new rate design imposes incentive rates subject to a heightened standard of review, and we apply the usual arbitrary and capricious standard.

The Commission maintains that the court owes "special deference" to its development of the "experimental" ICAP Demand Curve because regardless of the evidence in the record, "there is no substitute for reviewing the actual results of a regulatory action." *Interstate Natural Gas Ass'n v. FERC*, 285

F.3d 18, 30 (D.C. Cir. 2002). The court has recognized that "the formulation of such an experimental policy (where the probability of success is uncertain) is the type of activity that the [Commission] was created to perform, and we give great weight to the Commission's determination regarding this policy." *Pub. Serv. Comm'n v. Fed. Power Comm'n*, 463 F.2d 824, 828 (D.C. Cir. 1972). However, even this highly deferential standard of review "demand[s] an articulation, in response to serious objections, of the Commission's reasons for believing that more good than harm will come of its action — even experimental action." *Md. People's Counsel v. FERC*, 761 F.2d 768, 779 (D.C. Cir. 1985). Moreover, the deference the court affords the Commission is based on the understanding that the Commission will monitor its experiment and review it accordingly. *See Pub. Serv. Comm'n*, 463 F.2d at 828. Under these circumstances, the court will defer to the Commission's predictive judgment that the new rate design will result in "more good than harm," as long as the Commission articulates reasons for its judgment and responds adequately to ELCON's objections. Although the Commission did not schedule a sunset date or periodic review of the ICAP Demand Curve, it did require NYISO to file annual evaluations of the Demand Curve, *see Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,754, thereby ensuring that NYISO and the Commission will have the information needed to determine whether the rate design requires modification should their predictions fail to be borne out by experience. During oral argument ELCON suggested that the Commission's characterization of the ICAP Demand Curve as an experiment is a post-hoc rationalization, but even if true that would not change the result here, for we conclude that the petition must be denied under the ordinary APA standard of review.

## III.

ELCON raises a number of challenges to the Commission's approval of the new rate design. While ELCON maintains that

the Commission failed to consider certain objections, the record demonstrates otherwise, indicating that ELCON's challenges are to the Commission's predictive judgments and policy choices, to which the court owes deference.

First, ELCON contends that the Commission failed to consider objections that the ICAP charges under the Demand Curve were too high and that the slope of the Demand Curve was too gradual. ELCON points to the testimony of expert witness David W. Segal indicating that the Commission overestimated the annualized cost of installing a new peaker plant, underestimated the useful life of a new peaker plant, ignored the revenue earned from the energy and ancillary service markets, and overestimated the value of reliability to consumers. In fact, the Commission considered the objections raised by ELCON and determined based on the evidence offered by NYISO and its expert witness Dr. David B. Patton that the parameters of the ICAP Demand Curve were "appropriate and reasonable." *Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,623. After reciting the objections to Dr. Patton's estimates, *see id.*, the Commission explained that it considered the parameters to be reasonable, emphasizing the fact that the ICAP Demand Curve was initially proposed by the New York Public Service Commission ("NYPSC") and reflected a year of negotiations and discussions among NYPSC, NYISO, and ICAP market participants. *See id.* at 61,618, 61,623; *Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,754. While the Commission expressed some uncertainty about the accuracy of the exact points and slope of the Demand Curve, it observed that confirming specific parameters would require "some measure of experience," and required NYISO to monitor the results of the Demand Curve, expecting NYISO to review the Demand Curve with stakeholder input and to adjust the parameters as appropriate, subject to Commission approval. *Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,623. Moreover, as the Commission points out in

its brief, Segal's estimates were not offered as an alternative calculation of a reasonable ICAP charge but rather as evidence that such a calculation was difficult to determine administratively. Because there is substantial evidence in the record to support the Commission's conclusions, we defer to the Commission's evaluation of the experimental rate design.

Second, ELCON contends that the Commission failed to consider the increased costs that the ICAP Demand Curve will impose on electricity consumers. It cites Dr. Patton's estimate that the ICAP Demand Curve will increase costs by $70 million in New York City and $84 million in the rest of the State during the first year, Dr. Carl Pechman's estimate that the Demand Curve will increase costs by $700 million over a three-year period, and Strategic Energy's estimate that the Demand Curve will increase costs by $1 billion per year. The Commission considered and rejected these estimates. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,757-758. Noting that one intervenor concluded that Dr. Pechman's estimate was "grossly overstated," and that several intervenors argued that the long-term benefits of the ICAP Demand Curve would outweigh any short-term costs, *id.* at 61,757, the Commission concluded that by reducing volatility in ICAP revenues and spurring new generation capacity, the ICAP Demand Curve would "provide long term benefits to NYISO markets and customers," *id.* at 61,758. Indeed, the Commission emphasizes in its brief Dr. Patton's conclusion that any costs of the ICAP Demand Curve are "transitional and will be eliminated over time as the market moves toward a long-run equilibrium." Patton Aff. ¶ 61, at 17; Br. of Resp't at 37. While the Commission recognized that it could not predict the exact amount of savings achieved by the ICAP Demand Curve, *see Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,758, it did cite Dr. Patton's estimates that a 1% increase in capacity would yield savings of $1 million per year in the long term, and that even in the short term, the ICAP Demand Curve

could save New York City between $57 million and $212 million. *See id.* at 61,757 n.23, 61,758 n.24; Patton Aff. ¶¶ 22, 31 at 5, 8. The Commission also noted that compared to the vertical demand curve, under which the deficiency charge is equal to three times the annualized cost of a new peaker plant, the new rate design would provide savings. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,758. Because the Commission's predictive judgment that the ICAP Demand Curve will result in long-term savings is supported by substantial evidence in the record, and because the balancing of short-term costs against long-term benefits is within the Commission's discretion, the court defers to the Commission's policy choice.

Third, ELCON contends that the Commission failed to consider evidence in the record that the ICAP Demand Curve will not encourage investment in new generation capacity. ELCON cites comments by Energy East, New York City, Strategic Energy, and the Morgan Stanley Group suggesting that reluctance to build new generation facilities in New York State arises from concerns other than the structure of the ICAP market, and that the ICAP Demand Curve offers an "indiscriminate subsidy" to all capacity suppliers without requiring them to use their increased revenues to build new generation facilities in New York. The Commission considered and rejected these comments. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,763-64. The Commission explained that while it did not expect the ICAP Demand Curve to "alone result in more financing," it did expect that "more reliable and predictable ICAP revenues would contribute to a more reliable overall revenue structure for an ICAP supplier and thus play some role in improving that supplier's prospects for financing." *Id.* That expectation is supported by substantial evidence in the record, including the expert witness testimony of Dr. Patton, Dr. Thomas Paynter, and Mark Younger. Moreover, even if the record does not show "for certain that the Commission's

incentive policy *will* work . . . it is nonetheless true that the record does not show that such a policy *will not* work," and "we cannot say that the Commission's incentive theory lacks logic." *Pub. Serv. Comm'n*, 463 F.2d at 828. In response to the contention that the ICAP Demand Curve offers increased revenues to both new and existing capacity suppliers, the Commission explained that "all capacity suppliers, regardless of the age of their resources, are entitled to the same treatment in the ICAP market." *Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,764. On rehearing the Commission further explained that its "acceptance of the ICAP Demand Curve was based on its readjustment of the incentives for building new generation *and retaining existing generation.*" *Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,621 (emphasis added). The Commission thus considered ELCON's objections and articulated a reasonable explanation for rejecting them.

Fourth, ELCON contends that the Commission failed to consider its objection that the ICAP Demand Curve replaces price volatility with quantity volatility, thus discouraging bilateral contracts and destroying the stability needed to encourage investment in new generation capacity. According to ELCON, quantity volatility is more damaging than price volatility because LSEs "have no way to hedge against the uncertainty associated with the monthly required quantity." Br. of Pet'r at 37. The Commission considered and rejected this objection. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,759-760. In response to the contention that quantity volatility could not be hedged, the Commission quoted Dr. Patton's testimony that "LSEs will have the opportunity to purchase any quantity of capacity they desire in the forward market and the spot market provides a means to sell back any excess capacity purchased forward." *Id.* at 61,760 (quoting Supplemental Patton Aff. ¶ 17, at 5) (internal quotation marks omitted). The Commission further explained on rehearing that LSEs could "hedge most of

their [ICAP] obligations by purchasing an estimate of their ICAP obligation through bilateral contracts" and "sell[ing] the excess back into the spot market." *Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,622. The Commission also concluded that the quantity volatility under the sloped ICAP Demand Curve, which was limited to a range of 118% to 132% of peak load, was less extreme and thus less damaging than the price volatility under the vertical demand curve, which ranged from $0 to more than $200 per kilowatt-year. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,760; *Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,621-22. It further noted that any quantity volatility would likely decrease over time as market participants gained experience with the Demand Curve and as the market reached long-run equilibrium. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,760; *Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,622. Thus, the Commission adequately considered and responded to ELCON's objections.

Fifth, ELCON contends that the Commission failed to consider alternatives to the ICAP Demand Curve proposed by Strategic Energy, Con Edison, Energy East, and New York City. The Commission considered the two alternatives proposed directly to it and not to NYISO — bilateral contracts and demand response — and determined that they were compatible with the ICAP Demand Curve. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,763; *Rehearing Order*, 105 F.E.R.C. ¶ 61,108, at 61,621. Because the Commission provided a reasonable explanation for choosing the ICAP Demand Curve despite the proposed alternatives, the court defers to the Commission's policy choice.

ELCON's final objection, that the Commission "ignored substantial evidence that supply conditions in New York are not critical and thus do not justify the level of the Demand Curve ICAP charges," Br. of Pet'r at 23, is not properly before the

court. ELCON did not raise this objection in its petition for rehearing by the Commission, and thus it is waived. *See* 16 U.S.C. § 825*l*(b). In any event, NYISO presented evidence of a capacity shortage in New York, and the Commission pointed out that the ICAP Demand Curve would prevent future shortages. *See Initial Order*, 103 F.E.R.C. ¶ 61,201, at 61,756.

Accordingly, because ELCON fails to show that the Commission's approval of the new rate design was arbitrary and capricious, we deny the petition for review.

5-10-05
o:\slip\wp\2004\03-1449 Electricity Consumers FINAL.wpd
[sent to printer]